```
                                          FILED
                                  CLERK, U.S. DISTRICT COURT

                                      Feb 26, 2015

                                 CENTRAL DISTRICT OF CALIFORNIA
                                 BY:      PMC        DEPUTY
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGUERITTE KIBEL,<br>Plaintiff,<br><br>v.<br><br>AETNA LIFE INSURANCE CO.,<br><br>Defendant. | Case No. CV 14-3861 SVW (PLA)<br><br>FINDINGS AND CONCLUSIONS REGARDING DEFENDANT'S DENIAL OF BENEFITS |

Margueritte Kibel brought suit after Aetna denied her claim for disability benefits. After hearing oral argument and reviewing the extensive record, the Court concludes that Ms. Kibel proved her entitlement to long-term disability of benefits as of March 19, 2014. Ms. Kibel, however, did not establish an entitlement to a waiver of her life insurance premiums.

**Findings of Fact**[1]

One night in January 2000, Ms. Kibel awoke to numbness in her right arm. (A.R. 451). For the next year, she continued to experience intermittent numbness in her right hand as well as

---

[1] Many of the medical records bear the wrong patient name. (*E.g.*, A.R. 463 ("Margarita Kibel"); A.R. 482 ("Marguerite Kibel")). These discrepancies appear to be clerical errors. Aetna did not suggest that the records referred to anyone else, and circumstantial evidence — such as date of birth and patient history — indicates that the documents refer to Plaintiff. The Court reaches a similar conclusion with misspelled doctors' names. (*E.g.*, A.R. 586 ("P.B. Anderson")).

diminished vision out of her left eye. (*Id.*). She then submitted to a MRI, which revealed brain lesions. (A.R. 448, 477, 602). And on March 26, 2001, Dr. Asher Thompson diagnosed her with relapsing-remitting multiple sclerosis. (A.R. 448). Dr. Peter-Brian Andersson, a staff neurologist at UCLA, confirmed the diagnosis a couple weeks later. (A.R. 596).

Multiple sclerosis is an inflammatory disease affecting the central nervous system. The disease causes a person's own immune system to attack the nerves' protective sheath, called myelin, in a process referred to as demyelination. In its relapsing-remitting form, multiple sclerosis is characterized by attacks of worsening neurologic function (relapses) followed by periods of partial or complete recovery (remissions).

Fortunately, Ms. Kibel's disease remained in a state of remission for most of the next decade. (A.R. 596). At her first post-diagnosis examination, Dr. Thompson reported that Ms. Kibel suffered only "very mild fatigue . . . [and] no neurologic symptoms." (A.R. 455).[2] In fact, she was "alert, articulate, . . . and [there was] no evidence of cognitive impairment." (*Id.*). And, for years, her doctors continued to report that she remained asymptomatic. (A.R. 436, 442, 596-97). But they also observed that she was noncompliant with her pharmaceutical regimen and subject to significant psychological stressors from her professional and personal life. (A.R. 428, 436, 442, 596-97). Ms. Kibel, for her part, chalked up her relative well-being to healthy eating and exercise. (A.R. 436, 597).

Ms. Kibel, already a successful businesswoman in 2001, prospered professionally while her symptoms were in remission. (A.R. 448, 452, 596). She began a new job as a relationship manager with City National Bank in March 2011. (A.R. 234, 522). In this position, she managed client portfolios and fostered new client relationships, devoting about 35% of her time to the former and 65% to the latter. (A.R. 243). This job inherently imposed certain cognitive and interpersonal demands. (A.R. 243-44). And it also entailed "light" physical labor. (A.R.

---

[2] Fatigue is among the most common symptoms associated with multiple sclerosis. (A.R. 568, 590-92). Often, it becomes so severe that it interferes with normal activity. (*Id.*). But the causal connection between disease and symptom is mysterious, (A.R. 568-69, 575), and this kind of excessive fatigue can also stem from depression, rather than multiple sclerosis. (A.R. 569-70).

2

1   234).

2         Months passed at her new job without incident. Sometime during the latter half of 2011,
3   however, Ms. Kibel collapsed while accompanying two clients to a car museum. (A.R. 61, 564,
4   597). Then, a few months later, she again fell after a business lunch with her supervisor. (*Id.*).

5         At this point, Ms. Kibel decided to return to her doctors. (A.R. 597). She took some
6   time off work, (A.R. 565, 598), and met with Dr. Andersson on January 19, 2012. (A.R. 433-
7   45). Ms. Kibel complained of "vision impairment" and "mild fatigue." (A.R. 433). But Dr.
8   Andersson did not note any other symptoms, concluding that Ms. Kibel was a "[h]ealthy 41-
9   year-old." (A.R. 435). He ordered an MRI to assess the status of Ms. Kibel's multiple sclerosis.
10  (*Id.*).[3]

11        Eight days later, a radiologist named Suzie Bash authored a report interpreting the MRI
12  results. (A.R. 463-69). Dr. Bash detected "evidence of demyelinating disease" in Ms. Kibel's
13  brain and cervical spine as well as a "suggestion of demyelinating disease" in her thoracic cord.
14  (A.R. 464, 466, 468). Specifically, she found seventeen intracranial plaques, noted nine in her
15  cervical spine, and suspected two more in her thoracic spine. (A.R. 463-64, 466, 468-69). On
16  February 3, a nephrologist, Dr. Danny Farahmandian, corroborated this analysis. (A.R. 428).

17        On February 20, 2012, Dr. Andersson sent a letter to Dr. Farahmandian. (A.R. 464-27).
18  Although Dr. Andersson described Ms. Kibel as "[h]ealthy" and in "[n]o acute distress," he
19  relayed her complaints of episodic numbness in her right hand as well as generalized fatigue.
20  (A.R. 425-26).

21        Consequently, on March 6, Dr. Andersson wrote a brief note allowing Ms. Kibel to
22  resume working. (A.R. 423). Upon her return, Ms. Kibel informed her supervisor that she
23  suffered from multiple sclerosis. (A.R. 565). Her supervisor first asked if the disease would
24  interfere with her cognitive capacity, which offended Ms. Kibel. (*Id.*). The supervisor then
25  issued her a disciplinary warning for a "very serious violation of bank policy" she committed
26  while on leave (A.R. 542) — although Ms. Kibel "disputed the description of the events." (A.R.

27  

28     [3]    MRIs are important diagnostic tools for doctors treating multiple sclerosis patients because "neuroimaging indices correlate relatively well with cognition in MS." (A.R. 580).

1   565). Ms. Kibel ascribed great significance to this interaction: according to her, it "triggered her
2   symptoms" and sunk her into "a deep depression." (A.R. 73, 89, 565).

3         In late March, Ms. Kibel began taking Avonex, a drug designed to slow physical
4   degeneration. (A.R. 422). She stopped taking the medicine after developing a rash and feeling
5   shortness of breath, (*id.*), but Dr. Andersson later attributed this adverse reaction to other causes,
6   (A.R. 418).

7         On April 4, 2012, Ms. Kibel took an official leave of absence. (A.R. 89, 550). But she
8   did not begin prompt treatment; rather, she failed to appear at her first two doctors appointments.
9   (A.R. 421). The second absence prompted Dr. Andersson to send Ms. Kibel a letter, which
10  chastised her for not heeding his medical advice. (*Id.*). Indeed, Dr. Andersson bemoaned Ms.
11  Kibel's refusal to schedule a psychiatric evaluation for depression as well as her general
12  noncompliance with his suggested medication. (A.R. 282, 418, 421, 428).

13        It appears that Ms. Kibel finally returned to her doctors in early September. (A.R. 418).
14  Ms. Kibel revived her fatigue complaints, but Dr. Andersson nevertheless concluded that she
15  was healthy. (*Id.*). And Dr. Kandavel, an ophthalmologist, even found that astigmatism — not
16  optic neuritis or other degeneration related to multiple sclerosis — caused her vision problems.
17  (A.R. 417). Dr. Andersson's psychological prognostication was less charitable: he characterized
18  Ms. Kibel's depression as "a major limiting factor" and renewed his recommendation that she
19  seek a psychiatric evaluation. (*Id.*).

20        Doctors notes confirm that Ms. Kibel's symptoms remained static over the next two
21  months. Her depression continued. (A.R. 490-93). She felt stressed. (A.R. 490). And she
22  experienced intermittent trouble with her vision. (*Id.*). Still, her doctors thought she was "doing
23  ok." (A.R. 489).

24        Sometime in November, during this apparent remission, Dr. Farahmandian sent a letter
25  allowing Ms. Kibel to return to work. (A.R. 683). However, Dr. Farahmandian later explained
26  that this letter was not an expression of improvement; rather, Ms. Kibel was "very intent" on
27  trying to return to work. (A.R. 684). Therefore, despite a warning that "she may not be able to
28  [complete her job duties]," he wrote the letter as part of an "overall . . . attempt to find her limits

1    based on her symptomatology at the time and . . . not necessarily [in anticipation] of a full return
2    to work." (*Id.*). Ms. Kibel, however, did not work long — she soon after conceded that her
3    condition prevented her from fulfilling her job duties and resumed her leave. (*Id.*).[4]

4    In December, Ms. Kibel checked-in with Dr. Andersson. He noted that her "[m]edical
5    history [remained] unchanged." (A.R. 275). But she had decided to respect the doctor's
6    recommended pharmaceutical plan (*id.*) — a decision that bore no positive or negative results
7    through the end of February. (A.R. 485, 486, 488).

8    According to Aetna's records, Ms. Kibel filed her request for benefits on February 18,
9    2013. (A.R. 42). She sought long-term disability benefits as well as a waiver from premium
10   payments on her life insurance policy.

11   Dr. Farahmandian submitted a physician statement to accompany Ms. Kibel's claim,
12   which primarily summarized her diagnosis and treatment history. (A.R. 1825-27). Interestingly,
13   Dr. Farahmandian's "objective findings" of impairment were purely optical. (A.R. 1826). He
14   then specified restrictions should Ms. Kibel return to work: she could perform up to hen hours
15   per day of "[s]edentary work activity" — which "involv[ed] sitting most of the time, but may
16   involve walking or standing for brief periods of time," including "[e]xerting up to 10 pounds of
17   force occasionally" — so long as her workplace environment had "strict climate control" and
18   was designed to limit her stress. (A.R. 1826-27). Strangely, Dr. Farahmandian then indicated
19   that Ms. Kibel could "[o]ccasional[ly]"[5] climb, crawl, kneel, lift over 100 pounds, pull, push,
20   reach, carry, bend, twist, grasp, sit, stand, walk, or sloop. (A.R. 1827). He even permitted Ms.
21   Kibel to "operate a motor vehicle, [a] hazardous machine, [and] power tools." (*Id.*).

22   In response, Aetna retained Katherine Quinby, a registered nurse, to evaluate Ms. Kibel's
23   claim file. (A.R. 60). Ms. Quinby reviewed Drs. Kandavel, Andersson, and Farahmandian's

---

[4]  Ms. Kibel later said that when she returned to work, City National demoted her — telling her to reapply for a ten dollar per hour position — before terminating her in March 2013. (A.R. 598). It is unclear from the record whether this description referred to this attempt to return to work or to another occasion.

[5]  The physician statement defines "occasionally" in this context as anywhere from thirty minutes to two-and-a-half hours per day.

5

observations, (A.R. 66-67), and made largely unsuccessful overtures to Drs. Andersson and Farahmandian's offices. (A.R. 69-72, 74-76). Her review of medical records yielded four conclusions. First, Ms. Kibel suffered from multiple sclerosis. (A.R. 80). Second, the event precipitating Ms. Kibel's leave of absence was unclear. (*Id.*). Third, Ms. Kibel could return to sedentary work with climate and stress accommodations. (*Id.*). And fourth, Ms. Kibel's most recent medical examinations revealed a dearth of physical symptoms — "normal gait, no ataxia, no tremors" — but did admit "co-morbid diagnoses of anxiety/depression." (*Id.*).

Aetna decided Ms. Kibel's disability claim on May 16, 2013. (A.R. 332-33). Aetna conceded that Ms. Kibel suffered from remitting-relapsing multiple sclerosis. (A.R. 332). But, like Ms. Quinby and Dr. Kandavel, Aetna concluded that Ms. Kibel's vision problems were correctable and stemmed from astigmatism. (*Id.*). Aetna also shared Ms. Quinby's uncertainty over the event that caused Ms. Kibel to leave work. (*Id.*). And Aetna — apparently drawing from both Ms. Quinby's report and Dr. Farahmandian's physician statement — concluded that Ms. Kibel could perform "[a]ll physical activities . . . occasionally." (*Id.*). Aetna then observed that Ms. Kibel had "no abnormal exam findings" at her most recent medical appointments, and she failed to submit any records from a psychiatrist even though her doctors recommended that she consult one. (*Id.*). Finally, Aetna referenced a telephone conversation with Ms. Kibel where she purportedly said that she "could not return to work at [her] current employer . . . due to uncomfortable feelings towards co-workers and . . . violat[ions] [of her] privacy." (*Id.*). In light of this evidence, Aetna denied Ms. Kibel's disability claim. (A.R. 333).

Within six days, Ms. Kibel retained counsel and sent a letter to Aetna expressing her intent to appeal. (A.R. 339-42). In her letter, Ms. Kibel also notified Aetna that she intended to submit additional documentation of her condition. (A.R. 339).

This process began in October 2013. On the fifteenth, Ms. Kibel visited an independent medical examiner, who compiled a sixteen page report. (A.R. 596-611). Dr. Ezekial Fink, a board-certified Neurologist recorded Ms. Kibel's chief complaints: significant fatigue, a "chronic . . . gait derangement," numbness, heat intolerance, slurred speech, and issues with her memory and concentration. (A.R. 599-600). Indeed, Ms. Kibel represented that her impediments were

6

quite severe — she could work for only four hours before resting, she could only walk for fifteen minutes at a time, she had to balance herself frequently lest she fall over, her right arm and legs would go numb intermittently, her speech caused people to think she was inebriated, and she often would forget recent conversations. (*Id.*). Dr. Fink then conducted his own physical examination to assess Ms. Kibel's complaints. He found that Ms. Kibel suffered decreased sensation on the right side of her jaw, right arm, right leg, chest, and abdomen as well as deteriorated motor skills and reflexes, including a slightly atypical gait. (A.R. 600-01). Dr. Fink then offered his own impression of the evidence:

> [Ms. Kibel has] Relapsing Remitting Multiple Sclerosis with multiple chronic residual deficits rendering Ms. Kibel unable to work. It is my perspective, based on my evaluation of this patient and the review of the records, that Ms. Margueritte Kibel is unable to work because of progressive neuromuscular symptoms [sic], cognitive decline, and worsening fatigue associated with her multiple sclerosis (MS), This opinion is supported by the history, physical exam, and medical records provided.

(A.R. 601-02). He further specified:

> A critical review of the physical examination sections of Ms. Kibel's records, especially in light of my physical exam findings, show a progression of disease and loss of function. The asymmetry of reflexes in the lower extremities on the physical examination as well as increased tone in the right leg provides objective evidence of a longstanding chronic neurological injury (Chou et al, 2004). This is further supported by the progression of disease on imaging, with the noteworthy loss of volume in her brain. . . . Ms. Kibel's account of her treatment in the workplace suggests that her MS was substantially interfering with her cognitive abilities in the workplace. . . . [H]er fatigue complaint has been severe enough to justify medical management on several occasions.

(A.R. 603). This report implies that Ms. Kibel's condition deteriorated rapidly, for her prior medical examinations revealed mild physical symptoms. (A.R. 700).

7

Ms. Kibel revisited Dr. Andersson's office on November 1, 2013. (A.R. 410-12). Some of Dr. Andersson's findings corroborate Dr. Fink's examination. For example, Dr. Andersson noted similar reflexes in Ms. Kibel's extremities. (A.R. 411). Some of Dr. Andersson's conclusions are different but reconcilable — for example, Dr. Andersson described Ms. Kibel's station as "normal" and her gait as "cautious." (A.R. 411). Some of Dr. Andersson's other observations, however, contradict Dr. Fink's. (A.R. 700). Whereas Dr. Fink opined that Ms. Kibel suffered severe cognitive issues, Dr. Andersson found Ms. Kibel "[a]lert [and] articulate, [with] normal speech and language function." (A.R. 411). He said she had "normal attention." (*Id.*). In fact, Dr. Andersson detected "no evidence of cognitive impairment during the history and examination." (*Id.*).

On November 22, Dr. Maikel Mankarious reviewed fresh MRIs. (A.R. 665-70). His first report described Ms. Kibel's brain. (A.R. 665-66). It showed "[m]ild progression of [the brain] plaques." (A.R. 666). Many other relevant features of Ms. Kibel's brain — such as parenchymal volume, cerebrospinal fluid space, vascular flow, and mucus thickness — remained "normal" and "appropriate for age." (A.R. 665-66). The second scan examined Ms. Kibel's cervical spine. (A.R. 667-68). There, Dr. Mankarious found "evidence of demyelinating disease" as well as mild protrusions of Ms. Kibel's C3-4 and C3-6 discs. (*Id.*). He also noted a small calcified protrusion, but it had no significant ramifications. (A.R. 667). Last, Dr. Mankarious reviewed the MRI of Ms. Kibel's thoracic spine. (A.R. 669-70). He found that the thoracic cord was "normal" aside from a preexisting, minor bend centered at the T6 disc. (A.R. 669).

Between Dr. Andersson and Dr. Mankarious's reports, Ms. Kibel submitted her official letter of appeal. (A.R. 405-409). Once again, Aetna retained a medical professional to review the claim. This time, it charged Dr. Vaughn Cohan, a board-certified neurologist, with the task. (A.R. 697). On January 29, 2014, Dr. Cohan reviewed Ms. Kibel's records and tried to consult Dr. Andersson (who refused to talk because Ms. Kibel did not authorize peer-to-peer conference with Dr. Cohan). (A.R. 698-701). Dr. Cohan, like Dr. Kandavel, concluded that Ms. Kibel's visual issues were ophthalmological, not neurological. (A.R. 700). Second, he found that Ms.

Kibel's December 20, 2012 exam findings "did not confirm" her described symptoms of weakness, fatigue, unsteady gait, and paresthesias in her extremities. (A.R. 699). Third, he considered Dr. Fink's report "inconsistent with" Dr. Andersson's. (A.R. 699, 700). Dr. Cohan sided with Dr. Andersson because he, as the treating physician, was more familiar with Ms. Kibel's condition. (A.R. 700). Consequently, Dr. Cohan relied on Dr. Andersson's reports to conclude that Ms. Kibel did not suffer "any significant impairment in cognitive function" and her "symptomatology [was] secondary to depressed mood." (*Id.*). Dr. Cohan therefore opined that Ms. Kibel could have performed her job, which he considered a "sedentary occupation." (A.R. 698, 700, 701).

With the benefit of Dr. Cohan's report, Aetna denied Ms. Kibel's appeal for long-term disability benefits on March 12, 2014. (A.R 705-09). In its denial letter, Aetna implicitly adopted many of Dr. Cohan's conclusions. It again conceded that doctors had diagnosed Ms. Kibel with multiple sclerosis. (A.R. 708). But it found no evidence that Ms. Kibel was "functionally impaired" — at least not to the extent that she could not perform the "sedentary physical demand[s]" of her job. (*Id.*). Although Aetna admitted that Ms. Kibel reported physical and cognitive symptoms, such as paresthesias, unsteady gait, weakness, and fatigue, it concluded that the neurologic examinations were normal. (*Id.*). In doing so, Aetna minimized Dr. Fink's findings: first, Aetna adopted Dr. Andersson's findings to the extent they conflicted with Dr. Fink's; second, Aetna concluded that even under Dr. Fink's analysis, Ms. Kibel could perform her sedentary work.

Before Aetna closed its review by deciding her waiver of life insurance premiums claim, Ms. Kibel submitted one last piece of evidence. (A.R. 711-12). Specifically, she supplied the insurer with an MRI that, in the reviewing radiologist's opinion, showed "significant interval progression of [the] disease" over the past four months. (A.R. 714). Indeed, the MRI revealed multiple new plaques in Ms. Kibel's brain. (A.R. 713-15). Among them, Dr. Bash — the radiologist who reviewed Ms. Kibel's January 2012 MRI — described a new plaque extending from the left posterior corona radiata into the posterior limb of the left internal capsule, which the radiologist "suspected to contribute to the patient's new symptoms" (a "pronounced gait

9

disturbance . . . [and] right-sided leg weakness and numbness" over the past three weeks). (*Id.*).

The next day, March 20, Aetna denied Ms. Kibel's request for life insurance benefits. (A.R. 734-35). Aetna premised its denial on the reasoning in its long-term disability letter. (A.R. 734). Unsure of whether Aetna had the benefit of her most recent MRI, Ms. Kibel asked Aetna to reconsider the decision. (A.R. 738). The record divulges no reply.[6]

Consequently, Ms. Kibel filed suit on May 20, 2014. (Dkt. 1). The Court conducted a bench trial on December 16, 2014. (Dkt. 38).

## Conclusions of Law[7]

This case, arising under the Employee Retirement Income Security Act of 1974, is a *de novo* review of Aetna's denials of benefits. (Dkt. 18). Accordingly, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). Ms. Kibel claims entitlement to two kinds of benefits: long-term disability benefits and a waiver of life insurance premiums. (Dkt. 1, ¶ 20). Therefore, the Court must determine — based on the factual findings detailed above — whether Ms. Kibel was entitled to benefits under the relevant contractual provisions. Ms. Kibel carries the burden. *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010); *accord Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. 2011) ("In an ERISA action, the plaintiff carries the burden of showing, by a preponderance of the evidence, that he was disabled under the terms of the Plan during the claim period.") (citations omitted).

---

[6] On February 5, 2015, the Court ordered the parties to submit supplemental briefing regarding certain pieces of evidence. The Court considered the parties' interpretation of the evidence based on the documents already in the record. It did not consider any extrinsic evidence associated with those briefs.

[7] Although the prior section contained most of the Court's factual findings, certain factual matters — such as the exact language of the policy — are set forth below. The Court adopted this narrative organization for analytical clarity. The Court does not intend to convert factual matters into legal conclusions. Moreover, "[a]ny finding of fact that is more appropriately deemed a conclusion of law, or vice versa, is so deemed." *Mossler v. Aetna Life Ins. Co.*, No. CV 13-01945 SJO (MRWx), 2014 WL 3587511, at *1 n.1 (C.D. Cal. July 21, 2014) (citing *Garrison v. Aetna Life Ins. Co.*, 558 F. Supp. 2d 995, 996 n.1 (C.D. Cal. 2008)).

**I.     Long-Term Disability Benefits**

To receive long-term disability benefits for the first twenty-four months of disability, Ms. Kibel must show she was "totally disabled." (A.R. 332, 895). First, she must show that she suffered from a disease or injury. (*Id.*). Second, she must show that the disease or injury resulted in functional impairment — that is, it prevented her from performing with reasonable continuity the substantial and material duties of her job (and that she was not working in her own occupation). (*Id.*). The plan further defines "substantial and material acts" as "important tasks, functions and operations generally required by employers from those engaged in [one's] occupation and cannot be reasonably omitted or modified." (A.R. 893). The period of entitlement starts on the date she could prove disability and extends to the date she could no longer prove she was disabled. (A.R. 894).[8] *See Mossler v. Aetna Life Ins. Co.*, No. 13-01945 SJO (MRWx), 2014 WL 3587511, at *1-2 (C.D. Cal. July 21, 2014) (interpreting the same plan provisions similarly).

**A.     Disease or Injury**

Ms. Kibel suffers from a disease or injury. Both parties agree — and the evidence establishes — that Ms. Kibel has relapsing-remitting multiple sclerosis. Doctors diagnosed her with the condition in 2001. They repeated and reaffirmed that diagnosis for the next thirteen years. And not a single doctor questioned the diagnosis.

**B.     Functional Impairment**

The only disagreement, therefore, centers around functional impairment. Ms. Kibel's job entails both physical and cognitive demands. Ms. Kibel contends that as of February 29, 2012 — the date she took medical leave — her multiple sclerosis had diminished her mental and physical capacities to such an extent that she could no longer perform her job. The evidence, however, establishes disability as of March 19, 2014. Therefore, Aetna owed Ms. Kibel long-term disability benefits as of that date.

1.     <u>Evidence Prior to March 19, 2014</u>

---

[8]     Other conditions can terminate the period of disability, (A.R. 894), but they are not relevant here.

11

*a.     Physical Impairment*

There is insufficient evidence that Ms. Kibel's multiple sclerosis prevented her from performing the physical demands of her job before March 19, 2014. The evidence indicates that Ms. Kibel suffered "very mild fatigue" in 2001, and she worked for ten years after that without issue. Although her symptoms reemerged in 2011, doctors did not consistently observe worse physical symptoms. And the outlying evidence is either not credible or inadequate to sustain the requisite inferences.

The most credible evidence does not suggest sufficient physical impairment. The record's great constant is Dr. Andersson: he was a board-certified neurologist that treated Ms. Kibel from her disease's inception, including numerous in-person examinations. Thus, his reports are very credible. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (ascribing more weight to the several physicians who examined the patient in-person); *Oldoerp v. Wells Fargo & Company Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1254 (N.D. Cal. 2014) (crediting doctors who conducted in-person medical exams); *Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1320 (D. Ore. 2012) (finding the opinions of plaintiff's internists "persuasive" due to their familiarity with their patient); *Hodjati v. Aetna Life Ins.*, CV 13-05021 SVW, 2014 WL 7466977, at *14 (C.D. Cal. Dec. 29, 2014) (crediting the treating physician over contradictory evidence).[9] And Dr. Andersson's reports had one great

---

[9] The other medical professionals are less credible — at least to some degree — in comparison. Ms. Quinby is not a doctor, and she did not examine Ms. Kibel. *See Rorabaugh v. Continental Cas. Co.*, No. CV 05-03612 SBCRCX, 2006 WL 4384712, at *6 n.3 (C.D. Cal. Dec. 8, 2006) (giving "no credibility to the record review performed by [defendant's] nurse manager"). Dr. Farahmandian is not a neurologist. *See Barnett v. Kaiser Foundation Health Plan, Inc.*, No. C-92-4908 SBA, 1993 WL 738364, at *5 (N.D. Cal. Feb. 5, 1993) (considering doctors credentials when evaluating their credibility). And Dr. Fink examined Ms. Kibel only once (and his report is unreliable, as discussed *infra*) while Dr. Cohan never did. *See Saaloma*, 642 F.3d at 676 (crediting reports from doctors who examined the patient in-person over those conducting a review from written documents). Moreover, Ms. Quinby, Dr. Fink, and Dr. Cohan entered the landscape after Ms. Kibel's claim proceedings began. *See Lervick v. Hartford Life and Acc. Ins. Co.*, No. C13-212 MJP, 2014 WL 6997650, at *4 (W.D. Wash. Dec. 9, 2014) (according more weight to reports of a physician whose relationship with the patient preceded the claims process).

constant: Ms. Kibel suffered from "mild fatigue."[10] He made that diagnosis is January 2012. He reiterated it in December. And even in November 2013, Dr. Andersson failed to observe any significant physical impairment.[11] The Court cannot conclude that mild fatigue prevented Ms. Kibel from performing the physical demands of a relationship manager at a bank.

Other evidence lends support to Dr. Andersson's conclusions. Like the Court, Aetna's reviewing neurologist, Dr. Cohan, credited Dr. Andersson over others. Dr. Andersson and Farahmandian both allowed Ms. Kibel to return to work at some point — authorizations they would not have given had it been clear that Ms. Kibel could not perform her job duties. And most doctors visits resulted in observations that Ms. Kibel was "healthy," "doing ok," and "normal."

Furthermore, it is not clear that the fatigue derived entirely from Ms. Kibel's multiple sclerosis. Ms. Kibel admitted that she suffered from severe depression, and her doctors expressed serious concern about her psychological state. Since fatigue is a symptom of both multiple sclerosis and depression, Ms. Kibel's primary physical symptom shares an uncertain causal connection with her qualifying condition.

This evidence suggests that Ms. Kibel's multiple sclerosis did not impair her physical ability to complete her job duties, and the countervailing evidence cannot compel a contrary conclusion. The evidence indicative of more severe physical impairment is twofold: first, Dr. Farahmandian and Ms. Quinby opined that Ms. Kibel could perform sedentary work even though Aetna classified her job as more demanding; second, Dr. Fink submitted a report that chronicled severe physical symptoms. Dr. Farahmandian and Ms. Quinby's findings do not support an inference of functional impairment though. And Dr. Fink's report is unreliable.

---

[10] The other physical symptom supported by the record is visual impairment. An ophthalmologist determined that Ms. Kibel's optical problems stemmed from astigmatism, however, not multiple sclerosis. Moreover, the record divulges no evidence that Ms. Kibel's vision problems were severe enough to prevent her from completing her job duties.

[11] This conclusion is partially supported by MRI reports authored by radiologists. Those neurologists described these symptoms in the "history" section of those reports, suggesting that they relied on Ms. Kibel's doctors — presumably the treating doctor, Dr. Andersson, first and foremost — for that information. Therefore, the information there is fairly traceable to Dr. Andersson.

Dr. Farahmandian and Ms. Quinby concluded that Ms. Kibel could perform sedentary work. Ms. Kibel points out that Aetna classified her job as "light," which entails more physical demands than a sedentary position. Therefore, she argues that the evidence establishes that she could not perform her job duties. The evidence, however, is not so clear.

Two things are clear: first, on a scale of sedentary, light, medium, and heavy, Aetna classified Ms. Kibel's job as "light"; second, Dr. Farahmandian and Ms. Quinby posited that Ms. Kibel could perform sedentary work. But the apparent conclusion — that Ms. Kibel was incapable of meeting her job's physical demands — is belied by closer scrutiny. Dr. Farahmandian's physician statement indicated that Ms. Kibel only needed climate control and limited stress to return to work; and with those accommodations, he found that she could work ten hour days five times a week. These accommodations — as well as the "findings that substantiate[d] impairment" (which were only optical in nature) — do not indicate that Ms. Kibel was incapable of "light" work, which only differs from sedentary work by requiring exertion equivalent to ten pounds of force more frequently and an upward capacity of twenty pounds of exertion. Thus, the link between Dr. Farahmandian's objective findings and his ultimate conclusions is imperceptible.

The next page of Dr. Farahmandian's report generates further confusion. There, Dr. Farahmandian indicated that Ms. Kibel could perform a variety of physical feats inconsistent with a limitation to sedentary work. It is difficult, therefore, to draw a definitive conclusion from Dr. Farahmandian's physician statement.

And the doubt accompanying Dr. Farahmandian's submission carries over to Ms. Quinby's report. Ms. Quinby's report rested on the treating doctors' reports. And, in particular, her opinion that Ms. Kibel could perform sedentary work explicitly derives from other doctors' opinions. Since Dr. Farahmandian is the only doctor to have made such a finding, one must presume that Ms. Quinby relied on his statement. Consequently, the uncertainty undermining his conclusions subverts Ms. Quinby's as well.

The second piece of evidence evincing severe physical impairment is Dr. Fink's examination report. Dr. Fink's report, however, is not credible. First, Dr. Fink appears to have

relied on old MRIs. These MRIs were already interpreted by other doctors. And those doctors — including Dr. Andersson — did not note significant impairment. Thus, Dr. Fink's conclusions are questionable to the extent they rest solely on Ms. Kibel's neural imaging. The most reasonable explanation is that Dr. Fink relied on Ms. Kibel's self-reported symptoms (which pervade his report) when interpreting the MRI. These symptoms, however, are not borne out in any examination (indeed, the doctors' reports often note the contrary), and, as Dr. Cohan observed, are inconsistent with other statements by Ms. Kibel. Thus, Dr. Fink's conclusions rely on outdated data and unverified self-reporting. *See, e.g.*, *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) (discussing the potential unreliability of self-reported symptoms)

There is a further problem with Dr. Fink's report. Shortly after Dr. Fink's examination, Dr. Andersson observed Ms. Kibel and drew very different conclusions: he did not record any of the severe symptoms Dr. Fink described, instead describing mild symptomolgy. Moreover, the next MRI did not reveal significant demyelination that would explain the symptoms in Dr. Fink's report.

In sum, the record up to March 19, 2014, contains ample evidence that Ms. Kibel did not experience anything greater than mild physical impairment due to her multiple sclerosis. The inconsistent evidence suffers from significant reliability concerns. Therefore, Ms. Kibel did not carry her burden of showing that she was physically unable to perform the requirements of her job.

### *b.   Cognitive Impairment*

The evidence of cognitive impairment bears a similar a pattern. Since 2011, doctors observed demyelination in Ms. Kibel's brain, thoracic cord, and cervical spine. Even so, they found her in good health. As described above, she suffered from mild fatigue throughout late 2011, 2012, 2013, and into 2014. But doctors did not note significant cognitive impairment. For example, Dr. Andersson characterized Ms. Kibel as "healthy" in January 2012. He did so again a month later. And throughout 2012, Dr. Andersson and Dr. Farahmandian believed that Ms. Kibel was at least "ok" — they even exhibited more concern for her depression than her multiple sclerosis. Furthermore, Dr. Farahmandian's February 2013 physician statement noted no

cognitive difficulties.

Indeed, the first suggestion that Ms. Kibel suffered significant cognitive impairment appears in Dr. Fink's report. As discussed above, this report is unreliable. Dr. Fink's symptomatological findings rationalize Ms. Kibel's complaints. But Dr. Andersson's contemporaneous observations belie Dr. Fink's suppositions: just two weeks after Dr. Fink's examination, Dr. Andersson — although noting the same asymmetrical reflexes — perceived Ms. Kibel as alert and articulate, finding no evidence of cognitive impairment.

Thus, the record up to November 2013 shows no more support for cognitive impairment than it did of physical impairment.

### 2. Evidence of Disability as of March 19, 2014

On March 19, 2014, Ms. Kibel submitted a final MRI report. Unlike most prior diagnoses, which had observed moderate demyelination and mild symptomology, this report evinced significant impairment. Explicitly, it attested to Ms. Kibel's accounts of severe physical disability. Implicitly, it suggested worsening cognitive impairment. No doctor rebutted or questioned this report. Thus, its uncontroverted findings of substantial impairment suffice to meet Ms. Kibel's burden.

The report began by noting Ms. Kibel's complaints of "pronounced gait disturbance" as well as "right-sided leg weakness and numbness." The MRI, which post-dated all prior reports, lent credibility to her new complaints as it showed substantial progression of Ms. Kibel's multiple sclerosis. In particular, the MRI revealed several new brain plaques, including one of major significance. The radiologist explicitly "suspected" that the disease's progression "contributed to" the gait disturbance, weakness, and numbness.

This report is more than plausible. Multiple sclerosis is a progressive disease, and the MRI revealed that the disease had underwent a period of rapid progression — an apparent relapse. Moreover, the report noted that Ms. Kibel's new symptoms were three-weeks old. Thus, they do not conflict with prior evidence. And no doctor contradicts or questions this evidence.

Most significantly, the three new symptoms are sufficient evidence that Ms. Kibel could

not perform her physical job duties. As a relationship manager, Ms. Kibel conducted client development. This responsibility entailed travel as well as ambulation, evidenced by her first fall in 2011 that occurred when Ms. Kibel was at a museum with clients. A severe gait disturbance imposes a meaningful impediment to walking, let alone travel. Weakness and numbness in Ms. Kibel's right leg would only exacerbate these difficulties. Moreover, the symptoms likely impeded her ability to complete her job's "light" physical demands. Light labor — exerting twenty pounds of force occasionally or up to ten pounds of force frequently — is not an exacting demand. Still, it is more than onerous for someone experiencing significant difficulty walking and weakness in one leg.

Moreover, the MRI suggests further cognitive deterioration. There is a strong correlation between degeneration revealed through neuroimaging and cognitive difficulty. And the significant progression observed on the March 2014 MRI likely exacerbated Ms. Kibel's cognitive symptoms. It is difficult to be sure of the exact extent of her impairment, but, at a minimum, her fatigue likely worsened. Moderate fatigue would only aggravate the aforementioned physical difficulties, making it even less likely that Ms. Kibel could perform light physical labor (and, perhaps, the financial analysis and interpersonal reaction required by her job).

The unrebutted MRI report is sufficient evidence that Ms. Kibel could not perform her job. This report is dated March 19, 2014. Thus, as of that date, Aetna owed Ms. Kibel long-term disability benefits.

**II.     Waiver of Life Insurance Premiums**

Ms. Kibel also applied for a waiver of her life insurance premiums. Her plan imposed a stringent standard for qualification: the claimant's "disease or injury [must] prevent[] [him or her] from: [1] Working at [his or her] own job or any other job for pay or profit; and [2] Being able to work at any reasonable job. A 'reasonable job' is any job for pay or profit which [the claimant is], or may reasonably become, qualified for by education, training, or experience."

17

(A.R. 8).[12]  There is insufficient evidence that Ms. Kibel qualified for this waiver.

The Court described the evidence of physical and cognitive impairment above.  The physical impairments — gait derangement, leg weakness, and leg numbness — are insufficient to show that Ms. Kibel could not perform any reasonable job.  Although the record supplies no hypothetical alternative positions, Ms. Kibel appears capable of working in a purely sedentary position.  The early evidence supported that conclusion.  And difficulty with walking or leg weakness would not implicate one's ability to work in a completely sedentary position, which likely exists within the banking industry.  The possible cognitive deficits are too nebulous to shake this conclusion.  Although Ms. Kibel likely suffers from mild or moderate fatigue, the evidence does not support substantial cognitive impairment.  Ms. Kibel therefore failed to carry her burden of showing that she could not perform the duties of a reasonable alternative job.

**Conclusion**

For the foregoing reasons, the Court concludes that Defendant Aetna owed Plaintiff Margueritte Kibel long-term disability benefits beginning March 19, 2014.  The Court upholds Defendant Aetna's denial of benefits in all other respects.

IT IS SO ORDERED.

Dated: February 25, 2015

STEPHEN V. WILSON
United States District Judge

---

[12] The Plan imposes other requirements, (A.R. 8-9), but they are immaterial since this one is dispositive.